and also Industrial Maritime Carriers. May it please the Court, Your Honor, my name is Jason Weigenspach, I represent Industrial Maritime Carriers, referred to as IMC in our briefs. IMC is appealing two parts of the district court's judgment. The first is the district court's award to Freightplus a 30 percent tort indemnification against IMC. And then the second is the district court's failure to cast cargo in REM in judgment for IMC's unpaid freight. I want to begin with the tort, the issue of the tort indemnification, and there's two arguments there. The first one is, although the district court styled the award as one of indemnification, it was a 30 percent award, so it was really more in the lines of contribution. And the argument there is that there really was no basis for that, because the — the evidence is that IMC discharged the cargo at its contracted discharge port. So it's inconsistent to say that we were negligent for misdelivery when, in fact, we discharged at our contracted discharge port. And then the second element of this argument is that on the indemnification issue, Freightplus does not occupy a special relationship with IMC, which is a necessary predicate for recovery under tort indemnification. To start on the negligence issue first, I'd like to stress to the — stress to the court that in her findings of fact, the district court did not make a finding that IMC had committed an error when it designated Wharrie as the discharge port on the contract of carriage, which was the booking note, or on the vessel manifest, or on the draft billing that was generated by IMC. Kennedy. Let me make sure I understand what you're saying. It does seem to me the sense of her opinion is that, in fact, there's no evidence of what Yacht Path had actually told you. There's no documentary evidence of that, contrary evidence. So it does seem to me her — the implication is that she was finding that that was error. Are you saying that there needs to be a more precise finding, or are you saying something else? I'm saying that in the findings of fact, she did not make a specific finding that — that the designation of Wharrie and the IMC bill of lading was in error. And, in fact, she did the opposite. When she talked about the Freightplus bill of lading, she said that was an erroneously issued bill of lading full of misrepresentations, including a — a mistake on the — on the discharge port. When we talk about the IMC bill of lading, I also would like to address something that Your Honor just mentioned, and that is, is there a lack of evidence to prove that Yacht Path contracted with IMC to carry that cargo to Wharrie as opposed to Lagos? And the answer is yes. If you look in the record, specifically Exhibit 10, there is written confirmation from Yacht Path to IMC dated December 25, 2012, which was two days before this cargo was placed aboard the carrying vessel, which was called the Industrial Destiny. And in that — in that document, Kevin Cummings, representing Yacht Path, specifically says, we confirm Wharrie as the discharge port. In addition to that, the weight of the evidence is that every time there were communications between Mr. Cummings with Yacht Path and Kyle Branning, who was the intermarine employee who was negotiating with Mr. Cummings, there were documents that were generated. So, for example, the booking note was generated on December 20, 2012, showing Wharrie as the discharge port. That was sent to Mr. Cummings. When the — when the — there were communications with the technical department to talk about how are we going to handle discharge and loading at the load and discharge ports. Mr. Cummings was copied on those — on those communications, and that said Wharrie was going to be the discharge port. These folks were actually making plans on how are we going to get this vessel, this cargo unloaded in Nigeria. Then, when the cargo was actually loaded on board the Industrial Destiny, which was on the 27th of December, soon after that, there was a draft bill of lading and a vessel manifest, both issued. Both of them designated Wharrie as the discharge port. Both of them sent to Mr. Cummings. At no point, Mr. Branning testified at trial, at no point did anyone ever call him, e-mail him, or contact him in any way and say, hold on, Wharrie is the incorrect port. In fact, it was radio silence until he got the 27th of December — I'm sorry, 25th of December e-mail that confirmed, again, in writing, Wharrie is the discharge port. It wasn't until January the 3rd, 2013, when the vessel — the cargo is on the ship, the vessel is underway, on her way to Wharrie, that Mr. Cummings then sends an e-mail to Mr. Branning and for the first time says, wait a second, shipper may want Lagos as the discharge port. At that point, there's already a contract in place. The vessel owner is already performing. So the fact that now, after the fact, they're being advised that the shipper may want to change the discharge port doesn't obligate IMC to change their contract. And I might add, the e-mail from Mr. Cummings to IMC does not say, we made a mistake, it's supposed to be Lagos, not Wharrie. It does not say there's an inconsistency within the shipping documents on our end. What it says is, which port does the carrier prefer, Lagos or Wharrie? And then he says, well, this is Mr. Cummings in his e-mail, well, shipper would prefer Lagos, or shipper wants Lagos. I'm sorry, I think he said shipper wants Lagos. So, again, it's not as though, look, we have a mistake. We know because of other e-mails in the record that Mr. Cummings realized he had a mistake and he was trying to fix it with Ms. Keel from Freight Plus on their end, but no one communicated that to IMC. So what do we... The vessel agent wrote an e-mail, he was under the mistaken impression that Wharrie would be the vessel's only port of discharge in Nigeria. This is the district court speaking. That was the vessel's agent. I believe she was referring to the agent in Nigeria who was either the Super Maritime guy or the MGM folks. And what happened there was Mr. Cummings was communicating with the MGM folks and saying to them, without Intermarine's knowledge, without IMC's knowledge, there was a mistake on the discharge port. But IMC wasn't included in those communications. And if you look at later in those e-mail strings, Mr. Cummings says to that agent, I think I can get Intermarine to change the discharge port, but before I approach them, I want to ask you if it's even possible under Nigerian regulations. That agent then responds back and says it's too late to change, that the Nigerian authorities wouldn't allow the cargo to be discharged in Lagos. And I might also add there's lots of evidence in the record to show that once the vessel reached Lagos, the proper preparations with the government officials had not been made by the shipper. The shipper's agent could not be contacted. The port authorities hadn't been paid. And so the vessel couldn't have been discharged, I'm sorry, the cargo couldn't have been discharged in any event. But back to this issue on the negligence of IMC, it's undisputed that the only contract that was binding on IMC was the booking note that was signed on December 20, 2012, showing Warrie as the discharge port. It is also undisputed that this cargo was discharged in Warrie. So what does the district court say then, that this argument is unsupported, and says IMC has not produced evidence showing that the Yacht Path ordered the rebel to be shipped to Warrie even though IMC's policies require such documents to be retained? What the district court is referring to there is the fact that when Yacht Path first communicated with IMC around December 20, 2012, there were written instructions. It's Intermarine's policy to get written instructions for the bill of ladings, and those written instructions would have come from Yacht Path to Intermarine. Intermarine could not find those initial written instructions from Yacht Path to Intermarine for purposes of the bill of lading instructions. We submit, however, that the district court was incorrect when the district court ruled that there was no other evidence or that that argument was unsupported. The district court overlooked Exhibit 10. And again, Exhibit 10 is the e-mail, the written e-mail confirmation from Yacht Path to IMC confirming Warrie, in writing, confirming Warrie as the discharge port, and again, this was done two days before this cargo was placed aboard the Industrial Destiny in Houston. The district court did not mention that e-mail in her decision, and we believe that it was just simply overlooked. But it's incorrect to say the argument is unsupported. It's also supported, by the way, by the testimony of both Mr. Branning and by the fact that all of these documents showing Warrie as the discharge port were sent through the booking channels. And not once did somebody come back and say it's incorrect. Wasn't there testimony, maybe it was just an affidavit from a Yacht Path employee manager that's saying, in fact, we had never given that direction? Mr. Cummings at Yacht Path testified in his deposition, which was introduced at trial, that he had asked that the vessel be brought to Lagos and not to Warrie. He had no document — documentary evidence to back that up. And when he was confronted with the e-mail that he sent, he admitted that he had made a mistake. So Exhibit 10 e-mail, he was confronted with that? Yes. Yes, Your Honor. All right. And he admitted that he had made an error in that e-mail. We say admitted. He — under your view, he — oh, I see what you mean, that he did send the e-mail, but that was a mistake to have said Lagos. That's what he testified in his deposition. We come to the crux of the argument, and that is, if we — if we have a contract, which we do, that designates Warrie as the discharge port, and we have facts that show that that vessel was — that the cargo was, in fact, discharged in Warrie pursuant to contract, it's legally inconsistent to say that we performed pursuant to contract, but yet we still are liable for negligent misdelivery. Now, the district court based this holding on the fact that we knew — we found out on January the 2nd and 3rd, 2013, that the cargo — that the shipper wanted the cargo discharged in another port. But, again, the fact is, is that we were never told that this was a mistake. We were only told that this is what the shipper — that the shipper wanted to change the discharge port. A carrier is under no obligation to do that. Contracts — I mean, a booking note is a contract of refrainment, and maritime contracts, like all contracts, can only be amended if both parties agree. IMC never agreed to amend the contract. We would submit that it is — it is irreconcilable to say that a party performs pursuant to a valid contract, and yet is still liable in tort for negligent misdelivery. I'd like to turn now quickly to the issue of tort indemnification and the status of Freyplus. Freyplus is entitled to tort indemnification under the narrow theories of indemnification recognized in maritime law set out by this Court in Hardy. And one of them is that there has to be a special relationship between the indemnity and the indemnidor in order to trigger indemnification. What the district court said was Freyplus was an MVOCC, and so that made it a shipper vis-à-vis IMC. That was the special relationship, and that's sufficient for — to trigger indemnification. We submit to this Court, Freyplus could not be an MVOCC, at least not in its relationship with IMC, because it wasn't a shipper in its relationship with IMC. And the statutory regulations governing the definition of an MVOCC is clear. An MVOCC is an actor — a shipping intermediary that issues back-to-back bills of lading. From the bill of lading from the actual carrier, the VOC, they're a shipper, and then they issue their own bill of lading, wherein they're the carrier to the — to the shipper. In this situation, Freyplus was not a shipper in its relationship to MVOCC — in its relationship to IMC, does not appear on the bill of lading, does not appear on any of the shipping documents, and even Ms. Kuehl testified there was no relationship at all. I see my time is up, so I'll hand it over to you. A lot of ground to cover. Thank you. A lot of water to cover. Thank you. May it please the Court, Counsel, Kevin Walters for Freyplus. I'm an appellant on the issue of the Frey judgment against my client in Appalachia on the 30 percent indemnity judgment in my favor. I'll start with the indemnity judgment.      We are certainly an MVOCC. We are certainly an MVOCC. We are certainly an MVOCC. We're a carrier for purposes of our client, Freyplus. Counsel's argument that we don't appear in the shipper box on a draft copy, non-negotiable bill of lading is not dispositive. In fact, if that argument is accepted, that we have to appear in that box, in international shipping, there are several intermediaries, typically — many MVOs, non-vessel operating common carriers. If only the last common carrier MVO is going to be considered an MVO, what are the other ones in the chain? What is a non-negotiable? Non-negotiable, Judge, means that it's a mere receipt for the cargo. It's not a document of title. It does not need to be presented to obtain possession. In fact, the only negotiable bill in this case was the Freyplus bill, which was issued. And it gets me to the point about Judge Berrigan's finding that the Freyplus bill was erroneous or false. My client contracted with Yacht Path to take the Rebel to Lagos. That's what they thought up until the point that it was not in Lagos. They had no prior knowledge that it was not going to be discharged there. Mr. Cummings' behavior aside, they were our carrier. They were also IMC's shiprunner, their booking note, which IMC has said is their contract of carriage. That's who they dealt with. In fact, they dealt with IMC — IMC dealt with Yacht Path on a fairly regular basis. They had done eight to ten prior West African discharges for IMC. Moreover, with IMC, they allowed Yacht Path to ship repeatedly cargo without the contemporary payment of freight, which led to the issue here. The freight for the Rebel was not paid by Yacht Path. It was paid by Freyplus. It was paid by GAC to Freyplus. Freyplus to Yacht Path. That's where it stopped. Given the timeline issued in this case, it appears that they used that freight money to pay and get the release of prior vessels that had been shipped on IMC vessels without having received freight. So — Regardless of what they did with it, we know what they did not do with the money. That's true, Judge Hathaway. That's exactly right. But we do know that even after the shipment of the Rebel and the Roger K on this vessel, Industrial Destiny, they shipped other cargo before Yacht Path filed bankruptcy for Yacht Path without having received freight. The pattern continued. And this gets me to the judgment against my client for freight, which really only sounds inequity from Judge Berrigan's decision. We're not in contractual privity. We believe that IMC has either stopped or has waived their ability to seek freight from my client. They filed a proof of claim in the bankruptcy of Yacht Path. They never made demand on Freyplus for payment. Again, they facilitated, they enabled Yacht Path to continue to ship cargo without having paid freight, which obscured the true financial situation of Yacht Path and led to the problems in this case. With regard to the 30 percent indemnity, which is contribution finding, Judge Hathaway, you're correct. Judge Berrigan heard competing evidence on that point. Mr. Cummings had testified about what he did or didn't do. The judge made credibility and evidentiary determinations and found 70-30 is what she found. She said that my client was, had been negligent, but that IMC also was for not following their own internal procedures. They had a procedure in place to verify the accuracy of the information going into their shipping documents. It's not, as counsel suggests, that... Go ahead, please. Finish. I'll ask when you finish that. Now, as counsel suggests, that we're trying to hold them liable in tort for following their contract. It's that the contract was not generated following the recognized internal procedures that IMC put in place to ensure accuracy. I remember Judge Berrigan talking about not having preserved certain documents, but she also talked about procedures they would have followed when they got requests like this that would have confirmed the destination. I thought the problem she had is that they didn't have any kind of documentation to show what Yacht Path had told them. Yes, Judge. It's that IMC said that their procedure was they had to have written instructions to prepare the bills of lading, that they would not accept oral testimony over the phone. It had to be a formal... Okay. So we are talking about the same thing, and they couldn't produce that documentation. So it's failure to follow it or, regardless, they didn't have the documents anymore. But they do have this e-mail. What do you make of Exhibit 10? Give me your take on that. Well, again, Mr. Cummings, it's — if you look at the e-mail traffic, Judge, it's I want to go to Lagos, I'm going to Wari. It's back and forth. I'm not going to say that... Is that what Exhibit 10 says? What does Exhibit 10 say? Exhibit 10, I believe, refers to... It's an e-mail from Cummings to... It says Wari. It says it's from Cummings to IMC, and I believe it says Wari. Subsequent e-mails, again, it's this talking past each other, almost, in communications, and the judge decided, based on them not following their procedures, and also what went on in early January about, you know, there's an e-mail from IMC about getting incentive. And when we asked Mr. Brenting at trial what that meant, the judge was not impressed with his answer. So it was a fluid circumstance. There was certainly an opportunity to take corrective action. I'm arguing for indemnity. I believe that my client was not negligent. The only thing that was false or erroneous on the Freight Plus bill lading was that it said Lagos, and the cargo did not go to Lagos. We thought it was going to Lagos. The fact that the onboard date was different, the fact that it was a 50-year-old tug, and we didn't have a detailed description of paint scratches, that did not prevent GIC from drawing down on their LC. Their agent had our bill of lading in Lagos, and if the vessel had been, the cargo, the rebel had been discharged in Lagos, they could have obtained possession. They had. There was no causative connection with these negligent findings in our bill of lading that's related to this case. The only thing is the port of discharge. We would have to find that the district court was clearly erroneous, after weighing all the testimony, that Yoff-Pak did not communicate to IMC that Wary was the correct discharge port. Yes, I would agree, Judge Elrod. That is the standard. And I don't think it meets . . . In the court, there's perhaps competing evidence, if you look at this Exhibit 10, that the court found to the contrary. I would agree, Judge. And I'm arguing for indemnity, and I will concede that given the 70-30 split, I'm more likely to be in the contribution sphere, but I think it's fully supported by the findings below, the factual findings. As far as my client not being an MVOCC under the statute, that part, that 46-4101, it really deals with tariffs and conferences and antitrust, things that Congress addressed as far as rebates. And again, we are clearly a carrier, okay, and we do not operate ships. That is an MVOCC. And for the court to adopt a broad rule that the only MVOCC is the one who appears as a shipper in the VO's box would be very disruptive to present practices in international shipping. I imagine you worry about a generalist court speaking to maritime law and being disruptive, so we depend on all of you keeping us straight, despite your different points of view. Indeed. And not to cast aspersions on counsel's persuasive argument, I, again, have been found liable as a carrier, and now the request to you is that I'm a forwarder. I'm liable, and I've had to face a judgment from GIC, and now I'm not going to be a carrier. I'm clearly a carrier. I have a booking note with YATPAT. YATPAT has a booking note with IMC. IMC dealt extensively with YATPAT. They knew what they were dealing with. This was not a surprise. They had eight to ten West African transits before this case. So we would ask the court, one, as far as the 30% indemnity judgment, two, I'd like to get full indemnity, so I guess that's a reverse in render, but more realistically affirmed on the 30% that the lower court gave, and as far as the judgment against me for freight, it's our position that that should be reversed and you should render in favor of Freight Plus because IMC cannot come with clean hands and equity given the record below as far as their dealings and their relationship with YATPAT. This is not a case like in Strawn about a shipper being asked to pay twice. Their shipper is YATPAT. It's not Freight Plus. And with that, I will, unless the panel has any additional questions, I will reserve the rest of my time. I appreciate that you summed up all the various permutations of the case. Thank you. Thank you, Judge. May it please the Court, good afternoon, Your Honors. I'm Deseret Boone on behalf of the NV Rebel and GIC Services, the appellee. I am limiting my argument strictly to just the in-rim liability of Rebel for freight to IMC. Thankfully, the indemnity has nothing to do with us. You're limiting your argument to what? Just the cargo's liability in in-rim jurisdiction for freight to IMC. So it's our position that the creation of a maritime lien is not absolute just by virtue of a vessel, I mean, a vessel having cargo on board. Actually, one thing that I like this Court really said in Straychan v. Dresser is that the general rule of a maritime lien, that presumption can be destroyed or excluded or waived or modified when the parties engage in acts that are inconsistent with that privilege. One thing that the district court noted below is that the bill of lading that came from IMC was marked freight prepaid, which both Freight Plus, and I'm not going to argue for them, but Freight Plus and definitely GIC could rely on freight being prepaid as saying that there is no freight owed to IMC. The thing that is undisputed is that GIC services has paid over $100,000 to Freight Plus for the transportation of Rebel. At no time during the pending negotiations for the transportation of the tugboat or even up until, I believe, September of 2013 did my client even know of the existence of IMC. So they definitely did not have any privity of contract with them. One thing that IMC pointed out during their argument is that they feel that they've earned their freight because they performed their contract. Well, that begs the question, which contract did you perform? Because it certainly is not the one that the shipper, the owner of the tugboat, engaged in. Now – Help me go back to first principles. I'm going to show my ignorance. I don't do this every day like you do. What is – where is the district court's determination on this precise point? That is page 20 of the opinion. Page 20 of the opinion. Okay. Because I'm looking at the part about the attorney's fees and the lost profits and all of these things, and I'm trying to – and that's not what you're talking about. No, ma'am. And that's what – okay, you're only talking about the NREM amount. Okay. Thank you. Keep going. All right. So GIC, as I stated, paid over $100,000 – I believe it was $111,000 to Freight Plus for the transportation of Rebel to Lagos. At no time during the negotiation talks or any time before the tug was loaded onto Industrial Destiny did GIC know of Yacht Path or IMC's involvement in the transportation. And it wasn't until, like I said, September of 2013 that my client even knew that there was unpaid freight charges to IMC. My client did not know of Yacht Path's involvement in this case until the case was filed later in 2013. At all times, the conversation was strictly with Ms. Lisa Keel and no mention of any other parties. So one thing the case law and general equity mandates is that the shipper or the owner of the cargo must have privative contract with the vessel owner before the vessel owner can exercise a maritime lien over the cargo. Simply put, that was absent in this case, and it's undisputed. As opposing counsel pointed out, the only contract that IMC had was with Yacht Path and not GIC, the cargo owner. So with that being said, I'm trying to be a little brief, but there's not too much of an argument I can make, so if you have any questions, I'll be open. So if you want us to hold exactly what precisely? To affirm the holding of Judge Berrigan-Below that GIC or Rebel, as it were, is not liable for any freight to IMC. Because, in fact, it paid freight for the Rebel, or do we need to? Yes, ma'am. Well, on its face, yes, it paid freight for Rebel, but also there was no contract between IMC. So both reasons support the answer that you seek. Yes, Your Honor. Okay. And this is in connection with IMC's claim of a contractual lien. That's what we're talking about. Well, they haven't claimed a contractual lien. They're just saying by operation of maritime law that they deserve to exercise a lien over the cargo since it traveled on their vessel. And our position, which is supported by case law, and Judge Berrigan pointed out as well, that maritime lien is not absolute. And that question has been before this Court before. That maritime lien can be modified when, number one, there's no primitive contract between the cargo owner and the vessel owner, and the contract and the notice has to be made before the vessel is loaded. Right? Right. Okay. I think we understand your argument. Okay. Thank you. All right. Thank you very much. Your Honors, let me address the freight issue because I didn't get a chance to talk about it in my initial presentation. The freight issue is that Judge Berrigan declined to award freight against the cargo in RIM and instead awarded freight only against Freight Plus. On the theory that it would be inequitable to ask the owner of the cargo, which was GIC, to pay freight twice. And so she decided that under equitable principles. Our argument is that although we agree that Freight Plus is liable for the freight, we also think that she should have awarded it against the cargo in RIM because the cargo benefited from the carriage. Now, Mr. Boone is absolutely correct that we did not have a contract with Freight Plus — I'm sorry, with GIC. That's the reason why we didn't sue GIC in personam. But a carrier has a lien recognized by the law against cargo in RIM when carriage is performed, and that was the lien that we exercised. Well, is the equity that she recognized in this case unusual? I mean, it seems to me usually the cargo will benefit. I mean, not usually, but maybe sometimes you need it back, but this time maybe it benefited. So it seems to me the fact pattern is not that unusual. Is her decision really unusual? There's a decision on point, which is the Strachan v. Dresser decision. In that decision, this Court, the Fifth Circuit, held that when it — when there is a risk that a payer — I'm sorry, that a shipper has to pay twice or the carrier not get paid, that the shipper should be — should have to pay twice. But the Court distinguishes that precise case, so they say that it's not directly on point. She does, Your Honor. It's because the shipper doesn't have — in this case, there's not a contract which holds the shipper absolutely and unconditionally liable. You're correct, Your Honor. Why isn't that a pertinent distinction in this equity issue? Because in the Strachan case, there are multiple carrier defendants. The conference agreement only applied to one of them. The Strachan — so the conference agreement that was in place in Strachan didn't play a part in the Court's — in the Fifth Circuit's decision that all of the carrier defendants deserved to be paid for the carrier contract. The district court didn't make that distinction, but if you read the Strachan case, that distinction is there. And Strachan was recently — well, I say recently, in the late 90s — was followed by the Eleventh Circuit and the Saudi Arabian Natural Oil Company, which again said, look, this is a difficult choice. Do we make a shipper pay twice or the carrier go unpaid? And the policies of the Court is that the shipper has to pay twice. What about the Supreme Court's prior opinion in the Continental Grain case cited by the district court, Southern Pacific Transport Company? That opinion, we believe, is also distinguishable, Your Honor, because it didn't deal with — it didn't deal with an exact fact pattern that we have now where you have an intermediary that disappears with the money. And that's what we're dealing with here. That's what was dealt with by this Court in the Strachan case, and that's what was dealt with by the Eleventh Circuit. When a shipper pays a shipping intermediary, that intermediary doesn't pay the carrier and goes out of business or goes away. Who bears the risk of that? And under the decision of Strachan and under National Oil Company of Saudi Arabia, the policy of the courts have come out with is that the shipper bears the risk. Thank you. Your Honors, I believe that, properly, I don't have anything to rebut since I'm going to appellanapple these, so I rest. Thank you. I appreciate you clarifying for that. This has been a little cumbersome, but I appreciate the cooperative manner in which you've all worked through this. The Court will stand at recess until tomorrow.